GASTA *v.* FARMERS STATE SAVINGS BANK.

PAYMENT—RECEIPTS—EVIDENCE—BURDEN OF PROOF.

In a suit to enjoin the foreclosure of a mortgage, positive testimony by plaintiffs that payments represented by written receipts given to them by defendant were actually made, *held*, sufficient to sustain a decree in their favor; defendant failing to sustain the burden of proof to support its claim that one of the receipts given to plaintiffs included amounts represented by previous receipts.

Appeal from Bay; Houghton (Samuel G.), J. Submitted February 3, 1922. (Docket No. 39.) Decided March 30, 1922. Rehearing granted July 20, 1922.

Bill by Carl Gasta and another against the Farmers State Savings Bank to enjoin the foreclosure of a mortgage. From a decree for plaintiffs, defendant appeals. Affirmed.

*Collins, Thompson, Otto & McGinnis,* for plaintiffs.

*Kinnane, Black & Leibrand,* for defendant.

MOORE, J. On November 15, 1917, plaintiffs purchased from George W. Gleason and Lizzie J. Gleason, his wife, the land described in the bill of complaint, for the sum of $9,400, assuming as part of the purchase price two certain mortgages, one for $5,000, and one for $700, running to the defendant. It was understood by the plaintiffs that there was also $700 in interest on these mortgages that they had assumed. The date of the $700 mortgage was February 24, 1917. On December 10, 1917, the plaintiffs claim to have paid the sum of $350 to the defendant. On December 17th, $500, on December 28th, $350, and on December

29th, $1,050, in all $2,250.    Plaintiffs have receipts
for these payments.    On the 28th day of December,
1917, the mortgage for $700 was discharged by W.
S. Fotheringham, cashier of defendant bank.    The
$5,000 mortgage was dated March 7, 1916, payable
3 years from date, with interest at the rate of 7
per cent. per annum, interest payable December
15, 1916, and annually thereafter.    The $5,000 mort-
gage was assigned to the Agricultural Life Insurance
Company on September 16, 1916, and by them assigned
to the Michigan Live Stock Company on April 21,
1917, and re-assigned to the Agricultural Life Insur-
ance Company on May 12, 1917, and assigned by the
Agricultural Life Insurance Company back to the
Farmers State Savings Bank on January 4, 1919.    The
Farmers State Savings Bank also retained an interest
in this $5,000 mortgage at the time of the first assign-
ment amounting to one per cent. of the interest pay-
able by the grantors, the assignees taking the mort-
gage over upon a six per cent. basis, while it called for
seven per cent. interest.

On the 20th day of December, 1918, plaintiffs tend-
ered to Francis F. McGinnis, president of the Agri-
cultural Life Insurance Company, the sum of $4,444.54
in full payment and discharge of said mortgage.    Mr.
McGinnis refused to accept the same and discharge
the mortgage.    On the same day a tender was made
in legal tender to W. S. Fotheringham, cashier of the
Farmers State Savings Bank in the same sum.    The
tender was computed upon the basis of the plaintiffs
owing the sum of $4,150.    The tender was refused.
On December 27, 1918, a tender was made to Mr.
Fotheringham of the sum of $306.93 as interest due
up to said date, computed upon the basis of $4,150
being owed.    On January 27, 1919, the Farmers State
Savings Bank began the publication of a notice of
mortgage sale of said property for unpaid interest.

On the 31st day of March, 1919, one of the plaintiffs, Carl Gasta, learned of such publication, and upon April 1, 1919, the plaintiffs filed their bill of complaint in this cause asking for an injunction to restrain the Farmers State Savings Bank from proceeding with such foreclosure proceeding. No temporary injunction was issued. The defendant answered the bill of complaint. On October 1, 1920, the case was heard. The judge filed his findings on December 28, 1920, and on January 8, 1921, a decree was filed requiring the defendant to permit the plaintiffs to redeem for the sum of $4,506.49, the amount of principal and interest on said mortgage, computed on the basis of plaintiff's claim of $4,150 computed to the 7th day of March, 1919.

After filing the bill defendant proceeded with the foreclosure proceedings and the property was sold at sheriff's sale and bid in by the defendant. The defendant brings the case here by appeal.

The whole controversy arises over the question of whether $1,050 was paid when the last receipt was given. The plaintiffs assert it was. The defendant asserts no money was paid at that time.

The trial judge expressed himself as follows:

"On the trial of the cause, plaintiffs produced written receipts and witnesses testifying to the payments having been made to defendant bank on said mortgage, as follows: December 10, 1918, $350; December 17, 1918, $500; December 28, 1918, $350; December 29, 1918, $1,050, and introduced in evidence the receipts from defendant evidencing such payments, each of the receipts for $350 bearing evidence on its face that it was for interest on the mortgages in question, and the other written receipts, one for $500 and the other for $1,050, bearing evidence that they were given in payment of money on the so-called Gleason mortgages, which said written receipts and oral testimony produced by plaintiffs made a *prima facie* case by plaintiffs of the payment of $2,250, on said mort-

gages.   Defendant bank gave testimony in support of its claim that plaintiffs paid to defendant on December 10th, $350, and on December 17th, $500, and on December 28th, $550, instead of $350, for which the receipt was given by defendant bank on that day; that it gave no receipt for the $200 additional amount claimed to have been paid by plaintiffs but that the $500 formerly paid and the $200 paid on the 28th, over and above the amount receipted for, was applied to liquidate the said $700 mortgage, which was discharged.   Defendant bank gave further testimony that the receipt dated December 29th, for $1,050, did not represent any payment other than the $200 paid the day before, over and above said interest payment of $350, and that said receipt for $1,050 also included the two payments evidenced by the two receipts immediately preceding the one dated December 29th, the receipt of December 17th, of $500 and the receipt of December 28th of $350.

"While a receipt is not conclusive evidence of payment, the *prima facie* case having been made, the burden was on the defendant bank to show that the said receipt for $1,050 did not represent an actual payment of more than $200.   Jones on Evidence, § 492, and cases cited thereunder.

"The language used under the above references in part is as follows:

"'A written receipt is evidence of a high character, although it is not conclusive, it is *prima facie* evidence of the truth of the recitals which it contains.   It is evidence of so satisfactory a character as not to be overcome except by clear and convincing testimony; and the burden of proof as matter of course rests upon the one attacking it.'

"On the trial of the cause the testimony clearly disclosed that one of the parties hereto was mistaken. The testimony produced by plaintiffs in connection with the written receipts was clear, consistent and convincing, which established *prima facie* their claim. The testimony on the part of defendant disclosed some confusion in connection with the transaction, and admitted errors in connection therewith.   The testimony also disclosed that the mortgage indebtedness held by the bank against the property in question was not $6,400 but $6,050; that while two of the receipts stated

on their face to be in payment of interest on the Gleason mortgage, the facts disclosed on the hearing was that there was only $350 due on interest at the time the two receipts for $350 each were given in payment of interest. Defendant's witness writing one of said receipts for interest testified that notwithstanding the receipt bore on its face the words, 'To apply on the George Gleason interest on real estate mortgage,' that it was not received by him for that purpose.

"It also later developed that there was some understanding between said Gleason and the bank that plaintiffs were to pay to the bank $350 more than the mortgage indebtedness, an item of no great importance, only that it was a transaction in which the plaintiffs had no knowledge, as they had been led to believe that there was $700 of interest on said mortgages, which they paid to the bank, and took receipts for; while in truth and in fact there was only $350 of same due on interest, and the other $350, while the receipt bore evidence of its being for interest, was to be applied in some other manner, of which plaintiffs had no knowledge; also there was evidence to the effect that the record of the bank did not disclose that the $700 mortgage was discharged, but that the $700 paid by plaintiffs had been applied by the defendant bank on a note, a personal obligation of Mr. Gleason.

"From the references above made, and other like circumstances indicated by the testimony, it is quite apparent that the defendant bank not only made erroneous entries in connection with this transaction, but was otherwise mistaken in connection with some feature of the deal, and since the burden of proof is on the defendant to show that said receipt for the payment of $1,050 on the 29th of December was erroneous, and did not represent what it purported to represent, in view of all the testimony given in the case and the plain expression of the record made, the court is forced to conclude that this burden of proof has not been met, and in consequence thereof has to take the receipts as showing the fact therein, thereby showing the total payment of plaintiffs to the bank to be $2,250 up to and including the 29th day of December, 1919."

The claim of defendant is stated by his counsel as follows.   We quote from the brief:

"Plaintiff claims that when he got the $1,050 receipt on the 29th he paid that sum to the bank; defendant denies this; says Gasta paid no money on that date but asked for and obtained that receipt as covering his former payments.   It is undisputed that Gasta made a payment to the bank on December 28th, but he claims that on that date he paid only $350 while the bank claims he paid $550.   On that date Mr. Fotheringham gave Gasta a receipt for $350 specifying that it was one year's interest on the $5,000 mortgage, and thereupon proceeded to the court house with Mr. Gasta and discharged the $700 mortgage from the records.

"The following day, December 29th, Mr. Gasta came to the bank and asked for a receipt for the money he paid.   Mr. Fotheringham states that he thought he was asking for a receipt for the $200 (the amount of the payment being $550, $350 of which was receipted for as interest on the $5,000 mortgage), but Gasta wanted a receipt that would cover all his payments. Mr. Fotheringham states in detail in his testimony as follows:

" 'He was in the bank the next day, that would be the 29th. He came in and wanted a receipt for what he had paid.   He had had receipts previous to this for his different payments as he had made them, and I was going to give him a receipt for $200, and he says, "No, give me a receipt," he said, "I am done now, give me a receipt for the whole thing," and I did, not thinking that anything like this would come out of it.   I started to write the $200 receipt and that is when he asked for a receipt to cover the whole thing.   Exhibit E is the receipt that I gave him that day, that is on the 29th.   No money whatever was paid on that day, this receipt covering the whole transaction and showing what was agreed upon was paid.'

"The previous payments were as follows:

| | |
|---|---|
| First payment | $350.00 |
| Second payment | 500.00 |
| Third payment, amount of not covered by the $350 receipt of the day before | 200.00 |
| | $1,050.00 |

"The $1,050 receipt was given as a blanket receipt covering the above payments. It is defendant's claim that when Mr. Gasta got the $1,050 receipt on the 29th, he conceived the plan of claiming that he paid that sum of money in addition to what his other receipts showed and holding the bank for that amount."

The pivotal question in the case is, What was done when the receipt for $1,050 was given? Mr. Gasta's testimony is:

"On December 28th I went to the bank and paid Mr. Fotheringham, according to my receipt here, $350. The total payment by me was $350 at that time, and that is on December 28th. There is no question about that. On the next day December 29th I went back to the bank again and I paid $1,050 at that time. * * * My wife was with me at that time. I don't know as it could have been much after 2, because my wife went across and got the money out of the Bay City Bank, and that closes at 3 o'clock, and she carried the money right over with the band around it. . * * * When we got into the bank Mr. Fotheringham was there. I didn't notice who else, there was Mr. Fotheringham I was doing business with. * * * I talked with Mr. Fotheringham right at the desk there at the front part. I did not go inside of the rail, but talked to him over the desk. At that time I paid $1,050. I am sure of that.

"Q. Got it from your wife, right out of her pocket-book?

"A. I got part of it from her.

"Q. You only got part of it?

"A. Yes.

"Q. I thought you said a moment ago that your wife went over and got that $1,050 in the Bay City Bank and brought it over in a roll and handed it to you when you got to the bank?

"A. I didn't say $1,050. She didn't get $1,050 out of the Bay City Bank on the 29th day of December. I didn't get any $1,050 out of any other bank on December 29th. My wife brought over $500 and I went in the bank and she turned the $500 over to me and I took some more money out of my own pocket. I had pretty close to $600.

I turned over to Mr. Fotheringham $550 out of my pocket. I paid $1,050 altogether, and got a receipt from Mr. Fotheringham on the 29th day of December, 1917, for $1,050, and I actually paid $1,050 that day."

His testimony is confirmed by his wife except she says the payment was made December 28th, and the receipt was dated December 29th, because the bank official said the payment was after banking hours and the transaction would have to be carried into the next day's business. It is stated in the $1,050 receipt that the money is to apply on the Gleason account.

We have already quoted the version of the cashier as to the giving of this receipt. We again quote from the testimony of Mr. Gasta:

"With reference to the mortgage of $700, Mr. Fotheringham and I walked right up to the register of deeds' office, and it was discharged there while we were both together by Mr. Fotheringham signing on the book. The first knowledge that I had that there was any dispute between Mr. Fotheringham and I as to the amount owing on this property was about three months later. I don't know exactly. Mr. Fotheringham called me up and wanted to know if I was going to attend to that note in the bank, pay interest on it, or pay it, and I said, 'I have paid it.' This was over the 'phone, and he said 'no, you have not, and you are going to do something or I will do something,' so I told him to wait, I would get the receipts out of the safe, and read them to him over the 'phone, and when my wife got the receipts out I found out he was off the 'phone, so I got in the machine me and my wife, and went to the bank and seen him, and I asked him what was the trouble, and he says, 'you know what was the trouble,' he said, 'you either pay that today or I'll do something about it.' I don't know what he meant. 'Well,' I said, 'I came down here to find out what was wrong.' 'Well,' he said 'you know what's wrong, you pay that note or I will do something right away.' So I see I couldn't go ahead or deal with him, so I came down to the register of deeds' office and

218 Mich.—8.

asked Mr. Lambert to look it up, and he opened up several books and looked it up, and he said Mr. Fotheringham discharged it with his own signature. I said, 'Will you please call him up and tell him about it?' So what the conversation over the 'phone was that Mr. Lambert and Mr. Fotheringham had I couldn't say, but I could hear Mr. Lambert say, 'Why, you discharged it with your own signature.' Well, then, he told me that Mr. Fotheringham wanted me back to the bank, so I went back to the bank, and finally he said, 'Sit down and we will talk things over,' he said, 'Let me see these receipts.' I said 'I haven't got them with me.' He said, 'Where have you got them?' I said, 'The attorney has got them.' He said, 'Will you get them for me?' I said, 'I guess I can.' So I went up in one of the office blocks and had copies made of the original ones I had, and all they had me credited in the books was $350 of the whole thing, but he asked me to leave the copies there. I did not see the books at that time. He said, 'All you have paid on here is $350.' He said, 'Would you leave them copies here and we will talk things over,' and I left them."

The only reference the cashier made in his direct-examination to this interview is as follows:

"*Q.* Will you tell us how it was that this application of the payments that was made by Mr. Snowden came to your attention later?

"*A.* In going over our mortgages that was past due, Mr. Gasta, I believe, was written to that the mortgage was—interest payment had gone by and was not paid, and he came in and inquired about it, and it was then discovered that the application had been made on Mr. Gleason's notes instead of the mortgage."

We now quote from the cross-examination of the cashier:

"On December 28th I wrote this receipt out and wrote it all in my own handwriting. That is the day Gasta paid me $550. I didn't give him a receipt for $550 because he was getting a mortgage discharged for the balance—after the $350 for the application of the interest.

"*Q.* He was getting a mortgage discharge was the

reason you did not give him any receipt for only $350.

"*A.* Wouldn't he have a discharge in this?

"*Q.* I am just asking you questions.   This receipt is written in your own handwriting, interest on George Gleason mortgage of $5,000, December 15, 1917?

"*A.* Yes.

"*Q.* You knew at that time that Gasta was paying on the Gleason mortgage, on the interest against it?

"*A.* Well, there was $350 out of $1,400 that was to apply as interest on the $5,000 mortgage.

"*Q.* Well, answer this.   You knew that when you received these various items of money that they were paid you to apply on the Gleason mortgage?

"*A.* No, sir, I did not.

"*Q.* Then how did you come to take the money and write those receipts?

"*A.* The money was not all to be applied on the mortgage.

"*Q.* You didn't write that on any of the receipts, did you?

"*A.* Well, the receipts show for themselves.

"*Q.* Did you tell the truth on the receipts or lie when they were written?

"*A.* I don't think I lied about it.   The first receipt was written probably before we just figured it was best to accumulate all this money until the deal was finally finished, and possibly the writing of the interest in the first receipt might have been done before we really thought about how to handle the deal.

"*Q.* Then you want to say now that when you wrote these receipts out that what you knew and what you wrote out are two different things, is that right?

"*A.* No, I wouldn't say that.

"*Q.* You knew what you were writing there then?

"*A.* Yes, sir.

"*Q.* Was it so or wasn't it then?

"*A.* After the receipt was made—

"*Q.* Was it so or wasn't it, what you wrote on the receipts?

"*A.* Well, I won't say either way on that.

"*Q.* Do you know?

"*A.* Yes, I know.

"*Q.* Now on December 29th when you gave this receipt for $1,050 why didn't you give one for $1,400?

"*A.* Because he had one for $350 that made up the balance of the $1,400.

"*Q.* Well, he had one for $500, didn't he?

"*A.* Yes, sir.

"*Q.* And he had two for $350?

"*A.* Yes.

"*Q.* Then why did you give him a receipt for $1,050?

"*A.* Because he asked me to give him a receipt for the whole thing.

"*Q.* The whole thing was $1,400, wasn't it?

"*A.* Yes, sir.

"*Q.* And you didn't give him a receipt for the whole thing then?

"*A.* No, not on that one receipt, because he had the $350 receipt that paid the interest on the mortgage separate and distinct from the rest of the deal. He had two $350 and a $500 receipt. I knew that. * * * It was my business to report to the people that were keeping our books that that mortgage for $700 was to be marked paid. There seemed to be a misunderstanding between Mr. Snowden and I. Which of us just done wrong I am not prepared to say. It should have been the mortgage note that was canceled instead of one of Mr. Gleason's notes. I wouldn't be likely to come here and discharge a mortgage on the register of deeds' record and expect to continue it in the bank.

"*Q.* Well, as a matter of fact that is what you did do?

"*A.* Yes.

"*Q.* Then I say you made a mistake, or somebody did?

"*A.* Accidentally, yes, sir.

"*Q.* Now, I ask you about three months later than that instead of writing Mr. Gasta you called him on the telephone, isn't that the fact?

"*A.* It might be, I wouldn't say, possibly so.

"*Q.* When you called Mr. Gasta down here you claimed you had never discharged that mortgage, didn't you?

"*A.* I don't know how—we might have written him a letter or he might have come by telephone call.

"*Q.* Well, you said a moment ago you did call him by telephone, didn't you?

"*A.* I did not. I said we might have. I don't re-

member just how we asked him to come in.    When
Mr. Gasta did come to the bank I don't think that he
and I had loud words and argument about whether
this mortgage had been discharged.    I was not going
to call up the patrol wagon and have Gasta arrested.
I did not order him out of the bank that day.    I didn't
use profane language in front of Mr. Gasta's wife
that day and afterwards apologize for it.    I ascer-
tained from the register of deeds' office that I had
discharged the mortgage.    After that I got Gleason
and told him then that he owed us some money."

It has already appeared that  the $1,050  receipt
stated the money was to pay on the Gleason account.
It has also appeared from his testimony that Mr.
Fotheringham gave directions when money was paid
in how the money should be applied.

Mr. Snowden testified in part as follows:

"*Q.* Then in the due course of that particular trans-
action on the 29th, did you find he had paid all he had
to pay on that particular account?
"*A.* Yes.
"*Q.* And do you know what the total of that amount
was?
"*A.* Yes.
"*Q.* What was it?
"*A.* $1,050.
"*Q.* Did you dispose of and apply the $1,050 on the
29th of December?
"*A.* Yes.
"*Q.* Now did you apply it on any particular $5,000
mortgage or $700 mortgage?
"*A.* No.
"*Q.* What did you apply those payments on?
"*A.* I applied the payments on Gleason's notes, his
unsecured notes.
"*Q.* Is that a custom in the bank, to apply moneys
received on unsecured notes in the absence of any spe-
cific instructions to the contrary?
"*A.* Yes, sir.
"*Q.* And you followed the usual custom in that in-
stance?
"*A.* Yes.

"*Q.* Had you received any instructions to apply it directly on that $700 or any other mortgage?

"*A.* No.

"*Q.* So in the absence of specific instructions, you applied it where you considered it should be applied?

"*A.* Yes, sir.

"*Q.* In making the application that you did, did you cancel some of the notes of Mr. Gleason?

"*A.* Yes.

"*Q.* And to what amount?

"*A.* I canceled three notes, according to the records of the bank.

"*Q.* What were they, and the amounts?

"*A.* One for $835, another for $75, and another for $100, and then there was an indorsement, that is, a partial payment made on another note of $15, that is, the indorsement amounted to $15.

"*Q.* That you put on the back of the four hundred?

"*A.* Yes, that note was not canceled.

"*Q.* And that would make a total of how much applied?

"*A.* $1,025.

"*Q.* Now what disposition was made of the remaining $25?

"*A.* That was interest.

"*Q.* On what?

"*A.* On the notes that I had credited here.

"*Q.* That is, on the Gleason notes that you had canceled there was interest to the amount of what?

"*A.* $25."

The testimony is very conflicting and it cannot be reconciled. If Mr. Gasta paid $550 December 28th, as the cashier testified, it is difficult to understand why he gave a receipt for $350. If, as claimed by the cashier, the receipt for $1,050 was given to the plaintiffs to cover all previous payments made by them, why was it not given for $1,400, for these amounts had concededly been paid. It is also a pertinent inquiry as to why it stated the money was to apply on the Gleason account followed immediately by its application on that account.

This case of course is to be heard *de novo* by us and

is to be decided by the weight of the evidence as disclosed in the record. In case of conflicting testimony it is clear that the chancellor has a great advantage in hearing and seeing the witnesses. In the instant case we have the positive testimony of the plaintiffs that the money was paid. This testimony is confirmed by the written acknowledgment of the cashier that it was paid. A careful perusal of the record and the briefs of counsel and the able oral arguments of counsel, to which we listened attentively, has not convinced us that the decree is wrong.

It is affirmed, with costs to the appellees.

FELLOWS, C. J., and WIEST, CLARK, SHARPE, and STEERE, JJ., concurred. BIRD, J., did not sit.

The late Justice STONE took no part in this decision.